T.C. Memo. 2008-84

UNITED STATES TAX COURT

INDUSTRIAL ELECTRICAL AND INSTRUMENTATION, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19355-05.                    Filed April 3, 2008.

<u>Robert A. Shupack</u>, for petitioner.

<u>W. Robert Abramitis</u> and <u>Justin L. Campolieta</u>, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined the following
deficiencies in and penalties on petitioner's Federal income tax:

| Year | Deficiency | Penalty Sec. 6663 |
|------|------------|-------------------|
| 1999 | $358,153   | $268,614.75       |
| 2000 | 709,407    | 532,055.25        |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are: (1) Whether petitioner failed to report $1,411,100 in gross receipts for 1999 and $2,406,577 in gross receipts for 2000; (2) whether petitioner is liable for the civil fraud penalty for 1999 and 2000; and (3) whether the periods of limitations for 1999 and 2000 have expired.

                    FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, the second supplemental stipulation of facts, the third supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference. At the time petitioner timely filed its petition, petitioner had a mailing address in Boca Raton, Florida.

Petitioner, Industrial Electrical & Instrumentation, Inc. (IEI), was an active Florida corporation during the years at issue. Alfred White (Mr. White), during the years at issue and as of the date of trial, was a Florida State-certified electrical contractor. Mr. White was also the president, secretary, and treasurer of IEI during the years at issue. In 1995 Mr. White qualified petitioner to engage in electrical contracting

services.[1]  During the years at issue, and as of the date of
trial, petitioner remained qualified to perform electrical
contracting services.[2]  IEI is the only entity for which Mr.
White has submitted an application with the State of Florida to
qualify it to perform electrical contracting services.

On July 10, 1997, Mr. White signed an "Agreement to Qualify"
with Stewart G. Penny (Stewart), Lance Penny (Lance), and Sean
Penny (Sean) (collectively the Pennys)[3].  The agreement purported
to qualify Stewart to obtain permits to perform electrical
contracting services through Omni Building Contractors, Inc.
(Omni).  During the taxable years at issue Mr. White knew that
neither Omni nor the Pennys in their own capacities were State-
certified electrical contractors in Florida.  Omni was

_____

[1]  In order to qualify IEI, Mr. White filed an application
with the Florida Department of Business & Professional Regulation
Electrical Contractors' Licensing Board (the board).  Mr. White
then received notification from the board that IEI was authorized
to engage in electrical contracting.  To maintain the
qualification, Mr. White has to show that he has completed
continuing education every 2 years.

[2]  According to the board's frequently asked questions
section of its web site,
http://www.myflorida.com/dbpr/pro/elboard/documents/elecfaqs.pdf,
to qualify a business a contractor must agree to accept full
responsibility for the business including monitoring financial
transactions, signing permits, and supervising all jobs the
business participates in.  A primary qualifying agent must be an
officer or a supervising employee of the business.  Pursuant to
Fed. R. Evid. 201 we take judicial notice of the board's
definition of what it means to qualify a business.

[3]  Lance and Sean Penny are the sons of Stewart Penny.
Stewart Penny is deceased.

administratively dissolved by the State of Florida on August 13, 1993.  Pursuant to Fla. Stat. Ann. sec. 607.1421(3) (West 2007): "A corporation administratively dissolved continues its corporate existence but may not carry on any business except that necessary to wind up and liquidate its business".  On October 2, 1985, Stewart was enjoined by the Circuit Court of Dade County from engaging in electrical contracting in Florida.

Furthermore, pursuant to the "Agreement to Qualify", Mr. White agreed to transfer 49 percent of IEI's shares to the Pennys as follows:  23 percent to Lance, 23 percent to Sean, and 3 percent to Stewart.  Mr. White retained the remaining 51 percent of the shares of IEI.  Additionally, a Miami branch of IEI was to be established.  On July 10, 1997, the Pennys became officers and shareholders of IEI.[4]  The board of directors of IEI unanimously adopted resolutions naming the Pennys vice presidents of IEI. The resolutions were signed by Mr. White as secretary of IEI. The resolution naming Stewart vice president also named him general manager of the Miami office of IEI.  The three resolutions were titled "Authorize Appointment of Director or Officer".

The Pennys, with the approval of Mr. White, engaged in electrical contracting services during the years at issue under

---

[4]  IEI issued Stewart 15 shares of stock.  Lance and Sean each were issued 115 shares of stock in IEI.

petitioner's name.[5]  Petitioner maintained a checking account with First Union National Bank (corporate account), and Mr. White had sole signature authority.  The Pennys were given a deposit book in order to make deposits into petitioner's account, but they could not withdraw money from the account.

During taxable year 1999 IEI customer checks totaling $1,995,915 were made payable to petitioner.  Of that amount $551,815 was deposited by the Pennys into petitioner's corporate account and reported on petitioner's 1999 Form 1120, U.S. Corporation Income Tax Return; checks totaling $1,143,655.10 were cashed by the Pennys or Donna Penny (Donna) at check cashing stores and not reported on petitioner's 1999 tax return; and checks totaling $300,445 were endorsed by the Pennys to Classic Title, Inc. (Classic), deposited into an escrow account, and not reported on petitioner's 1999 tax return.  Petitioner's gross receipts for 1999 were $1,962,915 with a taxable income of $1,053,390.[6]  Petitioner's gross receipts were paid to petitioner for electrical services rendered.

During taxable year 2000 IEI customer checks totaling $3,087,667 were made payable to petitioner.  Of that amount

_____

[5]  Petitioner used the calendar year as its fiscal year.

[6]  The gross receipts amount for 1999 includes negative $33,000 in cash deposits which are allowed as redeposits of moneys received through the cashing of checks.

$667,809 was deposited by the Pennys into petitioner's corporate account and reported on petitioner's 2000 tax return; checks totaling $1,568,735 were cashed by the Pennys or Donna at check cashing stores and not reported on petitioner's 2000 tax return; and $851,123 was deposited by the Pennys into Bruce M. Harlan's Trust Account (Harlan Trust) and not reported on petitioner's 2000 tax return. The checks cashed at check cashing stores were endorsed with petitioner's name and by Stewart, Lance, or Sean, followed by the initials "V.P.", or by Donna. The checks deposited into the Harlan Trust were endorsed with petitioner's name, Sean's name followed by the initials "V.P.", and Bruce Harlan's name and trust account number. The checks deposited into the Harlan Trust were used to purchase real estate in trust for the Penny family. Petitioner's gross receipts for 2000 were $3,074,385.66 with taxable income of $2,086,491.[7]

The Pennys, as stockholders and officers of petitioner, negotiated and entered into contracts to perform electrical contracting services under the name of petitioner. The Pennys had business cards with the name and logo of petitioner.[8] The business cards also showed Mr. White's State-certified electrical

---

[7] The gross receipts amount for 2000 includes negative $13,281.84 in cash deposits which are allowed as redeposits of moneys received through the cashing of checks.

[8] The business cards indicated that Stewart was vice president and general manager, and that Lance and Sean were vice presidents.

contractor license number, which he obtained and used to qualify petitioner. Additionally, the Pennys, with Mr. White's awareness, used trucks and T-shirts with petitioner's name and logo. In 1999 and 2000 Stewart placed advertisements for petitioner's services in the telephone book under petitioner's name.[9] The Pennys issued customers invoices bearing petitioner's name and using Mr. White's license number. IEI's customers paid the invoices with checks made out to petitioner.

The Pennys deposited money into the corporate account when they needed to pay IEI's vendors and suppliers. Vendors and suppliers sent petitioner bills for electrical contracting supplies that the Pennys purchased on credit. Mr. White was aware, and approved, of the Pennys' performing electrical contracting work during the years at issue using petitioner's name and its credit because Stewart did not have good credit. One of the reasons that Mr. White entered into the "Agreement to Qualify" was to allow Stewart to use petitioner's credit rating. When petitioner received bills from a vendor or supplier, Mr. White faxed the bill to the Pennys at the Miami branch office of petitioner. Mr. White wrote checks from petitioner's corporate account to pay petitioner's supply bills with money that

---

[9] Alma Gordon contacted and hired petitioner after seeing its advertisement in the telephone book.

petitioner obtained through the performance of electrical contracting services by the Pennys.

Petitioner included the amounts paid to vendors and suppliers in the costs of goods sold it reported on its tax returns for 1999 and 2000. After the expenses were paid, Mr. White wrote checks to Omni for money that was left over in petitioner's corporate account. Before Mr. White made any payments to Omni, Stewart submitted a Form W-9, Request for Taxpayer Identification Number and Certification, on behalf of Omni. Mr. White wrote the checks to Omni because he did not want to have to withhold taxes. Petitioner included the checks drawn on the corporate account and made payable to Omni as subcontracting expenses in the cost of goods sold that petitioner reported on its tax returns for 1999 and 2000.

During the years at issue, the Pennys obtained permits to perform electrical contracting work with Mr. White as the qualifier and using petitioner's name. None of the Pennys put his name on the electrical contracting permits, nor did Omni. The permits were "pulled" with the knowledge and approval of Mr. White. The electrical contracting permits listed petitioner as the contractor.

On November 17, 1997, Stewart, acting on behalf of petitioner, signed a contract with the Presidential Condominium Association, Inc. (Presidential), to perform electrical

contracting services. Two days later, Mr. White signed a document authorizing petitioner to perform electrical contracting services at Presidential. Petitioner, and Mr. White personally, helped finance the electrical contracting services performed by the Pennys at Presidential.[10]

In 1998, petitioner sued Presidential in order to recover payment for services either performed or being performed. Stewart hired Andre Zamorano (Mr. Zamorano), an attorney, to represent petitioner. Lance, acting on behalf of petitioner, filed a claim of lien against Presidential. The claim of lien listed petitioner as the lienor. Mr. Zamorano filed a notice of lis pendens on behalf of petitioner and listed petitioner as plaintiff. Mr. Zamorano never heard of, or had reason to believe that he was representing, Omni. Mr. White was aware that the Pennys initiated the lawsuit on behalf of petitioner against Presidential and eventually settled. Presidential paid petitioner in 2000 with checks for the settlement of the lawsuit brought by petitioner. The Pennys or Donna cashed these checks at a check cashing store, and the proceeds were not reported on petitioner's 2000 tax return.

The Pennys negotiated contracts for petitioner to perform electrical contracting work for the Archdiocese of Miami

---

[10] Mr. White used an undisclosed amount of his own money to finance the project.

(archdiocese) at LaSalle High School (LaSalle).[11]  The archdiocese hired petitioner to complete electrical and wiring work on a lift station located at LaSalle.  After work began on the lift station, many other problems arose at LaSalle.  A project that was projected to take approximately 30 days to complete ended up taking approximately a year and a half, ending in May 2000.  The archdiocese and IEI drafted contracts for the LaSalle job.  The Pennys acted on behalf of IEI.

On behalf of petitioner Stewart hired workers for the LaSalle job.  At the LaSalle jobsite they wore T-shirts with petitioner's name and logo and occasionally drove a truck emblazoned with petitioner's name and logo and Mr. White's license number.  Petitioner paid them in cash.  Additionally, the Pennys acting on petitioner's behalf hired Kring's Shoring, Inc., and Ringemann Plumbing, Inc., as subcontractors to work on the LaSalle job.

At the direction of Stewart, Donna prepared invoices for the archdiocese for services rendered by petitioner at LaSalle.  Petitioner's name was at the top of each of the invoices.  Furthermore, using petitioner's letterhead, Stewart issued requests for payment to the archdiocese.  To pay for petitioner's electrical contracting services the archdiocese wrote several

---

[11]  LaSalle is owned by the archdiocese.

checks payable to petitioner, not to the Pennys or Omni.[12]  The Pennys changed some of the checks from the archdiocese by adding the Harlan Trust to the payee portion of the check.

Mr. White hired Robert Cole (Mr. Cole), a certified public accountant, to prepare petitioner's corporate tax returns for 1999 and 2000.  Mr. White signed petitioner's 1999 and 2000 tax returns.  Mr. White gave Mr. Cole monthly portions of a "transaction detail" report that Mr. White prepared.[13]  Mr. Cole used the monthly reports to prepare petitioner's tax returns for 1999 and 2000.  The "transaction detail" reports did not include all Presidential's payments to petitioner.  Furthermore, the "transaction detail" reports for 1999 and 2000 did not include proceeds of checks to petitioner that the Pennys did not deposit into petitioner's bank account but instead cashed at check cashing stores, endorsed to Classic, or deposited into the Harlan Trust.  Petitioner made payments to Omni that are reflected in the "transaction detail" reports prepared by Mr. White for 1999 and 2000 as payment for "outside services".

---

[12]  One of the checks from the archdiocese was endorsed by Mr. White payable to petitioner in the amount of $132,332.80.

[13]  The "transaction detail" report Mr. White prepared does not reflect all of IEI's activity but is only a partial transaction log.  The "transaction detail" report shows accounts receivable, accounts payable, and other expenses incurred by IEI.

During the years at issue, petitioner was a cash method taxpayer. At no point during 1999 or 2000 did Mr. White ask the Pennys how much money they had received on the jobs they performed on behalf of IEI.

OPINION

I. Unreported Income

The Commissioner's determinations generally are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Durando v. United States, 70 F.3d 548, 550 (9th Cir. 1995). Once there is evidence of actual receipt of funds by the taxpayer, the taxpayer has the burden of proving that all or part of those funds are not taxable. Tokarski v. Commissioner, 87 T.C. 74 (1986).

There is ample evidence linking petitioner to an income-producing activity (IEI), and respondent has demonstrated that petitioner received unreported income.

II. Fraud

The fraud penalty is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from a taxpayer's fraud. See Helvering v. Mitchell, 303 U.S. 391, 401 (1938). Fraud is intentional

wrongdoing on the part of the taxpayer with the specific purpose to evade a tax believed to be owing. See McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).

The Commissioner has the burden of proving fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b). To satisfy the burden of proof, the Commissioner must show: (1) An underpayment exists; and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. See Parks v. Commissioner, 94 T.C. 654, 660-661 (1990). The Commissioner must meet this burden through affirmative evidence because fraud is never presumed. See Beaver v. Commissioner, 55 T.C. 85, 92 (1970).

A. Underpayment

An "underpayment" is the amount by which the tax imposed exceeds the excess of the sum of the amount shown as the tax by the taxpayer on his return, plus amounts not so shown that were previously assessed (or collected without assessment), over the amount of rebates made. See sec. 6664(a).

Petitioner argues that there is no underpayment because the money the Pennys earned performing electrical contracting services was income either to the Pennys or to Omni. Further, petitioner claims that it was not actively engaged in the

performance of electrical contracting services during the years at issue but merely allowed the Pennys to use its name, its credit, and Mr. White's electrical contracting license. We disagree.

The Pennys wanted to engage in the electrical contracting business but did not have a license to do so. In fact, the State of Florida enjoined Stewart from being in the electrical contracting business. As a result, the Pennys made a deal with Mr. White whereby they would become officers and shareholders of IEI and thus have access to a license and be able to engage in the electrical contracting business.

Petitioner relies on the language in the "Agreement to Qualify" that the work performed by the Pennys was performed by Omni, not IEI. Omni could not have performed electrical contracting work as it was not licensed to do so, and a license holder had not qualified Omni to perform electrical contracting services. Pursuant to Florida law, a licensed electrical contractor can qualify a business organization to engage in electrical contracting. Fla. Stat. Ann. sec. 489.521 (West 2006). Additionally, at least one officer or supervising employee of the business organization must be qualified to engage in contracting in the category of the business conducted. Id. sec. 489.521(5). Mr. White was not affiliated with Omni in any way; thus he could not qualify Omni to perform electrical

contracting services (neither could the Pennys). Mr. White could, and did, qualify petitioner to perform electrical contracting services, and the Pennys were shareholders and officers of petitioner.

Mr. White testified that one of the reasons he entered the agreement with the Pennys was to enable them to "pull" permits. The permits were "pulled" with petitioner's name, not Omni's.

With Mr. White's knowledge and approval, the Pennys used petitioner's goodwill and credit to obtain clients and supplies. The Pennys used business cards, trucks, and T-shirts emblazoned with petitioner's name and logo. Customers who hired petitioner[14] never heard of Omni. Workers hired by the Pennys to perform electrical contracting services never heard of Omni, only petitioner. Mr. Zamorano, an attorney hired by Stewart to file a lawsuit on behalf of petitioner, never heard of Omni. The electrical contracting work performed by the Pennys was on behalf of petitioner, not Omni or the Pennys as individuals because it could not have been performed by Omni, or the Pennys as they were not licensed.

Income is be taxed to the individual or entity which earns it. Lucas v. Earl, 281 U.S. 111 (1930). Petitioner cannot

---

[14] Customers entered into agreements with IEI to perform electrical contracting services. Customers did not enter into agreements with Omni or the Pennys as individuals.

contract away its liability for Federal income taxes, nor can it anesthetize us to the fact that it tried to do so. Gibson v. Commissioner, T.C. Memo. 1982-374. Further, taxation of income cannot be escaped by anticipatory arrangements assigning it to someone else. Id. The "Agreement to Qualify" was an anticipatory agreement that attempted to assign all of petitioner's income to the Pennys and/or Omni despite the fact that the work was performed by or on behalf of petitioner.

The business that held itself out to the general public and its patrons was IEI, not Omni. Petitioner had advertisements in the telephone book, issued invoices with its name on them, had its workers wear T-shirts with its name and logo on it, and had trucks with its name, logo, and Mr. White's license number on it. Additionally, all customer checks were made out to petitioner, not Omni or the Pennys. Other than Mr. White, the witnesses who testified had never heard of Omni.[15]

Respondent has shown by clear and convincing evidence that during the taxable years at issue, petitioner engaged in the electrical contracting business and did not report all of its

---

[15] This case is similar to Omnitec Corp. v. Commissioner, T.C. Memo. 2006-202. In Omnitec, the Court held that the income was earned by Omnitec Missouri as opposed to Omnitec Nevada because the record indicated that everyone doing business with Omnitec believed it was Omnitec Missouri and had no knowledge of there being an Omnitec Nevada. Omnitec, unlike this case, did not involve a civil fraud penalty. The similarity in name to Omni in this case is strictly coincidental.

gross receipts on its tax returns.  Proceeds of checks that were
not deposited into petitioner's checking account were not
reported on petitioner's tax return.  Instead of depositing the
checks into petitioner's bank account, the Pennys, officers and
shareholders of petitioner, either cashed the checks at check
cashing stores or endorsed them over to Classic or to the Harlan
Trust.

In 1999, petitioner had unreported gross receipts of
$1,411,100 from its electrical contracting business.  Petitioner
reported gross receipts of only $551,815 and a net loss of
$8,002.  Respondent determined that petitioner's correct taxable
income for 1999 was $1,053,390.[16]  We agree with respondent.

In 2000, petitioner had unreported gross receipts of
$2,406,577 from its electrical contracting business.  Petitioner
reported gross receipts of only $667,809 and a net loss of

---

[16]  The corrected taxable income of $1,053,390 for 1999 is
computed as follows:

| | |
|---|---|
| Gross receipts | $1,411,100 |
| Costs of sales | 476,339 |
| Net operating loss | (56,308) |
| Salaries and wages: | |
|   Cash payments | (293,400) |
| Salaries and wages: | |
|   Reclassified | |
|     contract labor | (476,339) |
| Total adjustments | 1,061,392 |
| Previously reported | |
|   taxable income | (8,002) |

$13,084. Respondent determined that petitioner's correct taxable income for 2000 was $2,086,491.[17] We agree with respondent.

Accordingly we conclude that petitioner understated its income in both 1999 and 2000.

B. Fraudulent Intent

The Commissioner must prove that a portion of the underpayment for each taxable year at issue was due to fraud. Sec. 7454(a); see also Profl. Servs. v. Commissioner, 79 T.C. 888, 930 (1982). The existence of fraud is a question of fact to be resolved from the entire record. See Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts. See Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995, 1006

---

[17] The corrected taxable income of $2,086,491 for 2000 is computed as follows:

| | |
|---|---|
| Gross receipts | $2,406,577 |
| Costs of sales | 510,000 |
| Salaries and wages: | |
|   Cash payments | (307,002) |
| Salaries and wages: | |
|   Reclassified | |
|     contract labor | (510,000) |
| Total adjustments | 2,099,575 |
| Previously reported | |
|   taxable income | (13,084) |

(1982), affd. 748 F.2d 331 (6th Cir. 1984). A taxpayer's entire course of conduct can be indicative of fraud. See Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). The following badges of fraud have been used to prove fraud: (1) Understating income, (2) maintaining inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) filing false documents, (10) failing to file tax returns, and (11) dealing in cash. No single factor is necessarily sufficient to establish fraud. A combination of a number of factors constitutes persuasive evidence. Below we discuss the factors that we find to be present.

In the case of a corporation, such as petitioner, the fraudulent activities of a corporate agent or officer may be imputed to the corporation if: (1) The wrongdoer so dominates the corporation that it is, in reality, a creature of his will, his alter ego or, (2) the agent was acting in behalf of, and not against the interests of, the corporation. M.J. Laputka & Sons, Inc. v. Commissioner, T.C. Memo. 1981-730.

### 1.  Understating Income

Petitioner, as we found above, understated its gross receipts in both 1999 and 2000, and as a result also understated its taxable income in both years.  Only funds deposited into petitioner's bank account were reported on its return.  However, petitioner earned significantly more than was deposited into the account.  Petitioner argues that the money from electrical contracting services belonged to Omni or the Pennys individually.  We disagree.  See supra.

### 2.  Maintaining Inadequate Records

Petitioner kept a "transaction detail" report that was little more than a reflection of the activity of petitioner's corporate account.  Petitioner's "transaction detail" report did not reflect the checks that were cashed at check cashing stores or endorsed to Classic or the Harlan Trust.  The report did not reflect all of petitioner's business.

### 3.  Implausible or Inconsistent Explanations of Behavior

In his testimony, Mr. White acknowledged that he was aware that petitioner was working on the Archdiocese job and that it was a "significant" job.  Mr. White claimed that the income from this work was the Pennys', he did not know how much the job was worth, and it was not his business to know.  Despite these

claims, Mr. White endorsed a check from the archdiocese payable to petitioner in the amount of $132,332.80.

### 4. Concealment of Income or Assets

The stockholders and officers of petitioner concealed petitioner's income through various methods. In 1999 officers and shareholders of petitioner endorsed over to Classic checks totaling $300,445 payable to petitioner.[18] In 1999, officers and shareholders of petitioner cashed at check cashing stores checks totaling $1,143,655.10 made out to petitioner.[19] In 2000, officers and shareholders of petitioner cashed at check cashing stores checks totaling $1,568,7335.50 made out to petitioner.[20] Also in 2000, officers and shareholders of petitioner endorsed over to the Harlan Trust checks totaling $851,123 made out to petitioner.[21] By not depositing the money in the corporate account and distributing the money from the corporation, petitioner avoided "double taxation" on millions of dollars.

Officers and shareholders of petitioner exhibited a pattern of concealment of IEI's income during the years at issue. The

---

[18] Four checks were endorsed to Classic in 1999.

[19] Forty-seven checks were cashed at check cashing stores in 1999.

[20] Twenty-seven checks were cashed at check cashing stores in 2000.

[21] Six checks were endorsed to the Harlan Trust in 2000.

incidents were not isolated, but were continuous throughout the 2-year period.

### 5.  An Intent To Mislead

The behavior described in relation to the concealment of income also indicates an intent to mislead.  Once again, the behavior was continuous on the part of petitioner's officers and shareholders.

### 6.  Filing False Documents

Petitioner's 1999 and 2000 tax returns indicate that Mr. White was the sole shareholder.  The two tax returns failed to disclose that the Pennys were shareholders and officers who collectively owned 49 percent of petitioner.[22]  As we have found, the returns understated petitioner's income by large amounts for both 1999 and 2000.

### 7.  Dealing in Cash

During 1999 and 2000, petitioner dealt in cash.  The cashing of checks at check cashing stores has been detailed supra.  In addition, petitioner paid its workers in cash.  Michael Delucia and Jamie Massey testified that petitioner paid them in cash for their services performed for petitioner.

---

[22]  Although Mr. White claimed that he was the only officer of petitioner, he never disputed that the Pennys were shareholders.

8. Petitioner's Arguments

Petitioner relies heavily on the argument that the Pennys were not officers of petitioner and that Mr. White was the only officer. Petitioner argues that Mr. White's actions were not fraudulent, and therefore neither were petitioner's. We disagree. Mr. White endorsed a check payable to IEI in the amount of $132,332.80 that he knew was never reported on petitioner's tax return. Mr. White was more involved with petitioner than he claimed. Mr. White knew that petitioner had a major project at LaSalle and work at other locations, yet the documents he turned over to Mr. Cole did not include much of the income those jobs generated for petitioner. Pursuant to Fla. Stat. Ann. sec. 607.0830 (West 2007), a director must discharge his or her duties in good faith, with ordinary care, and in a manner he or she believes to be in the best interests of the corporation. Even if we assume arguendo that Mr. White's conduct on behalf of petitioner was not fraudulent, the Pennys were officers and shareholders of petitioner; and their actions in their capacity as officers and shareholders of petitioner also establish that petitioner is liable for the civil fraud penalty. The Pennys, who were 49-percent shareholders, were, together with Mr. White, the dominant figures of petitioner. See M.J. Laputka & Sons, Inc. v. Commissioner, supra. Petitioner's counsel admitted at trial that Stewart was a "thief, a liar, and a

crook".  Stewart, however, was the general manager of IEI's Miami branch, a vice president, and together with Lance, Sean, and Donna ran that branch of petitioner on a day-to-day basis.

All of the electrical contracting work that petitioner undertook in 1999 and 2000 was the result of the Pennys' efforts. Pursuant to Florida law, when in the usual course of business of a corporation an officer or other agent is held out by the corporation, or has been permitted to act for it or manage its affairs, in such a way as to justify third persons who deal with him in inferring or assuming that he is doing an act within the scope of his authority, the corporation is bound thereby.  Edward J. Gerrits, Inc. v. McKinney, 410 So. 2d 542 (Fla. Dist. Ct. App. 1982).

We conclude that respondent has proven by clear and convincing evidence that petitioner fraudulently underpaid its taxes for 1999 and 2000.

Once the Commissioner establishes that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud and subject to a 75-percent penalty, except with respect to any portion of the underpayment that the taxpayer establishes is not attributable to fraud.  Sec. 6663(a) and (b).  Petitioner has not proven that any part of either underpayment is not attributable to fraud.  Therefore, the

underpayments for 1999 and 2000 are subject to the 75-percent penalty.

III.  Period of Limitations

Petitioner argues that respondent cannot assess the tax liabilities petitioner reported on its tax returns because the statutory periods of limitations have expired.

In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed at any time.  See sec. 6501(c)(1).  A fraudulent return deprives the taxpayer the bar of the statutory period of limitations for that year.  See Badaracco v. Commissioner, 464 U.S. 386, 396 (1984); Lowy v. Commissioner, 288 F.2d 517, 520 (2d Cir. 1961), affg. T.C. Memo. 1960-32; see also Colestock v. Commissioner, 102 T.C. 380, 385 (1994).

We found that petitioner filed fraudulent income tax returns for 1999 and 2000; therefore, the periods of limitations on assessment for both of these years remain open.

In reaching all of our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

                              Decision will be entered

                         for respondent.